THOMAS C. ROONEY, JR., INDIVIDUALLY AND AS MAYOR OF THE CITY OF PATERSON, PLAINTIFF, v. SYLVIA L. McEACHERN, CLERK OF THE CITY OF PATERSON, ELIZABETH VAN D. SMITH, SUPERINTENDENT OF ELECTIONS OF PASSAIC COUNTY, CITY OF PATERSON, A MUNICIPAL CORPORATION, LAWRENCE F. KRAMER, CYRIL YANNARELLI, MARION M. RAUSCHENBACH, SAMUEL HUGHES, RAMON CARRION, TERESA BJORNDAL, RICHARD FONTANELLA, RALPH DiMARCANTONIO, ORABELL NICKELSON, NICHOLAS DeLUCCIA, MICHAEL DeLUCCIA, DOMINICK DeMARCO, ANTHONY ZIRROLLI, WILLIAM MASON, MARTIN I. BARNES, RAY CASSETTA, MANNY E. MORALES, AND FRANK X. GRAVES, JR., DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided May 31, 1974.

*Mr. Sheldon A. Weiss* for plaintiff (*Messrs. Glauberman and Weiss,* attorneys).

*Mr. William Miller* for defendant Sylvia L. McEachern.

*Mr. Joseph L. Conn* for defendant Lawrence F. Kramer (*Messrs. Conn and Kluger,* attorneys).

*Mr. Leo Gallene* for defendant Cyril Yannarelli (*Messrs. Merrey and Merrey,* attorneys).

*Mr. Peter T. Bongiorno* for defendants Samuel Hughes, Ralph DiMarcantonio, Dominick DeMarco, Raymond Cassetta, and Frank X. Graves, Jr.

*Mr. Harry Rapkin* for defendant Ramon Carrion (*Messrs. Iannacone, Rapkin, Chessin and Carrion,* attorneys).

*Mr. Alfred Fontanella* for defendant Richard Fontanella (*Messrs. Fontanella, Shashaty, Leonard, Cozine & Harris,* attorneys).

*Mr. Arthur J. Lesemann* for defendant Orabell Nickelson (*Messrs. Mazer and Lesemann,* attorneys).

*Mr. George Sokalski* for defendant Nicholas De Luccia.

*Mr. Dennis Cummins* for defendant William Mason.

*Mr. William J. Brogan* for intervenors.

JOELSON, A. J. S. C. Plaintiff is the present mayor of the City of Paterson under a unique form of government which has been declared by our courts to be invalid. In an election held May 14, 1974 he was a candidate for mayor under a changed form of government scheduled to commence on July 1, 1974. In that election plaintiff Thomas Rooney received 12,699 votes and defendant Lawrence Kramer received 12,860. The other three candidates for mayor received 2,779 votes altogether. A recount obtained by plaintiff confirmed these results. He now brings this action in lieu of prerogative writs to require a run-off election due to the fact that

neither he nor Kramer received a majority of the total votes cast.

The form of government under which plaintiff has been serving as mayor was declared unconstitutional and invalid on July 6, 1972 in the case of *Mason v. Paterson,* 120 *N. J. Super.* 184 *(Law Div.* 1972), aff'd 62 *N. J.* 471 (1973). However, it was extended from time to time in order to allow the choice of a new form of government and the election of new municipal officers under the changed form of government. The last extension is scheduled to expire on July 1, 1974, at which time the duly elected officers under the new form of government are scheduled to take the oath of office.

At the general election of November 1972 the electorate approved the selection of a charter study commission under the Faulkner Act *(N. J. S. A.* 40:69A–1 *et seq.)* and elected five charter commissioners. At the following general election of November 1973 the electorate, by a vote of 9710 to 3841, approved the plan recommended by the charter study commission, namely Mayor-Council Plan D, a nonpartisan type of government.

For reasons which will be developed hereinafter, the complaint urges in the alternative that if the court does not order a run-off election, it should require a new referendum on the form of government to be established in the City of Paterson, and allow the invalidated form of government with plaintiff as mayor to continue until a new referendum can be accomplished and new municipal officials elected. The only other candidate who has instituted an affirmative action to require a run-off election is Ramon Carrion, who finished in fourth place for one of the three councilman-at-large positions. His case was orally argued with this one.

With regard to the run-off problem, *N. J. S. A.* 40:69A–161, which was originally enacted in 1950 provides for run-offs generally in nonpartisan municipal elections when a candidate does not receive a majority of the votes cast. The only nonpartisan plans originally excepted from the run-off requirement were certain municipalities operating un-

der Small Municipal Plans A and B. These exceptions are to be found in *N. J. S. A.* 40:69A–118 and *N. J. S. A.* 40: 69A–136 which were also enacted in 1950.

Subsequently, however, in 1956 the Legislature enacted *N. J. S. A.* 40:69A–161.1, which eliminated the necessity for a run-off in any municipality under Mayor-Council Plan A or D by providing that "the candidates receiving the greatest number of votes cast shall be elected to the respective offices."

If *N. J. S. A.* 40:69A–161.1 is a valid enactment, no run-off election should be required in Paterson which will operate under Plan D. The New Jersey Supreme Court has already dealt with the question of the constitutionality of *N. J. S. A.* 40:69A–161.1 in *Batistich v. Brennan*, 45 *N. J.* 533 (1965). This court is of the opinion that the decision in that case clearly upholds the constitutionality of the statute as far as its prospective effect is concerned, although it does hold that it would be unconstitutional to apply it retroactively to any municipality, the form of government of which was adopted prior to 1956 when *N. J. S. A.* 40:69A–161.1 was passed. It held that retroactive application would create the vice of special legislation as it would at the time have applied to only two municipalities, but it also held that prospective legislation would be unobjectionable as it would be general in nature.

Although the decision in *Batistich* is clear enough, the headnote in the report is misleading. In subheading 3 it is stated flatly that "the act is unconstitutional as special legislation," and it then compounds the error by referring to Justice Haneman's persuasive concurring opinion as a dissent. In *New Jersey Statutes Annotated* the annotation to *N. J. S. A.* 40:69A–161.1 repeats the misleading language of the headnote.

■ This points up the danger to a lawyer in relying on a headnote. A careful reading of the opinion in *Batistich* sustains the constitutionality of the statute when applied prospectively, and finds it invalid only "insofar as retroac-

tive application goes." (at 535). Since the Paterson voters adopted Plan D in 1973, many years after the enactment of *N. J. S. A.* 40:69A–161.1, the statute cannot be regarded as special legislation on the basis of retroactivity. On the contrary, as far as Paterson is concerned it is prospective legislation of a general nature.

Councilmanic candidate Carrion disputes that *Batistich* held that *N. J. S. A.* 40:69A–161.1 is valid even in its prospective application. Yet the opinion in that case specifically stated:

If the statute operated prospectively only, the power of the Legislature to offer that further choice by a statute adopted as a general law could not be denied. Indeed the statute here in question must be accorded that future operative effect. [at 535]

In view of this clear expression from our Supreme Court, this court believes that if there is to be any change, it must come from the Supreme Court. However, the court will add that it sees no special legislation involved when the statute is applied prospectively, because no municipality whose voters decide against Plan D as amended by *N. J. S. A.* 40:69A–161.1 is obliged to adopt Plan D. It can turn to another of the various forms of government not affected by *N. J. S. A.* 40:69A–161.1.

Counsel for Carrion also relied in his brief on the contention that when *N. J. S. A.* 40:69A–160 was amended in 1970, the Legislature repealed *N. J. S. A.* 40:69A–161.1 "by implication." He withdrew this contention at oral argument. As a matter of fact, the amendment of *N. J. S. A.* 40:69A–160 is important since it establishes that in 1970 the Legislature was mindful of the continuing existence of *N. J. S. A.* 40:69A–161.1 and was bent on maintaining it. It should not be overlooked that the Legislature exempted municipalities operating under Plans A and D from coverage under the 1970 amendment of *N. J. S. A.* 40:69A–160 when it intentionally excluded Articles 3 and 6 from the amendment. Thus, the Legislature apparently was intent on pre-

serving the exclusion of Plans A and D (Articles 3 and 6 of the Faulkner Act) from the run-off requirement.

The court is, therefore, of the opinion that *N. J. S. A.* 40:69A–161.1 is still in existence and operative in this case. However, plaintiff stresses an additional point arising out of the report of the charter study commission and its actions subsequent to that report. The report, dated July 31, 1973, states on page IV–9: "Equally significant is the required runoff election if no candidate for a particular office obtains a majority vote.*" This asterisk is explained on page IV–14 with the following footnote which indicates that in this case we are dealing with faulty headnotes and erroneous footnotes:

An effort was made to eliminate the run-off provision from Mayor-Council Plan D (as well as Mayor-Council Plan A) by laws of 1956, Chapter 24. That statute was held unconstitutional in *Batistich v. Brennan*, 88 *N. J. Super.* 84 (*App. Div.* 1965) affirmed per curiam 45 *N. J.* 533 (1965), and on the basis of this decision the Commission has referred to the run-off as still part of the nonpartisan election system of Mayor-Council Plan D. Unfortunately, some of the language of the Court's opinion as distinguished from the judgment, may be used to argue that the 1956 statute is still effective to eliminate the run-off in municipalities which adopt Mayor-Council Plan D after 1956. In order to avoid a shadow of a doubt, the Commission recommends that specific legislation be sought at the next session of the Legislature to repeal the laws of 1956, Chapter 24.

After filing their report of 56 pages plus exhibits, the charter commission then embarked on a direct mailing of a so-called "official Summary of Report on New Government for Paterson." According to the verified complaint, in late October and early November 1973, 50,982 copies of this pamphlet were mailed, addressed to "Postal Customer." This brochure which is attached to the complaint consists of eight pages and definitely states that a run-off would be required if a candidate failed to achieve a majority of the total votes cast. It asserts: "To win election a candidate must receive 50% of the vote plus one vote or there is a run-off between the two receiving the greatest number of votes." Most

of the publication, however, is devoted to an explanation of the recommended form of government under the caption "Mayor-Council Plan D. Why Plan D?" It also appears that on one or more occasions, the charter study commission circulated the same re-run misinformation in a newspaper advertisement.

The referendum question at the general election of November 1973 was in the precise form mandated by statute, *N. J. S. A.* 40:69A-14. It was headed "New Paterson City Charter Question," and read as follows:

Shall Mayor-Council Plan D of the Municipal Charter Law, providing for a division of the City into 6 wards, with 9 Councilmen, one to be elected from each ward and three to be elected at large, be adopted by the City of Paterson.

Along with the question itself was an "Interpretive Statement" which read as follows:

A vote of Yes is a vote in favor of a new City Charter providing for non-partisan elections of a Mayor and a Council of nine members as above.

A vote No is a vote to revert to the 1871 Charter since the present or 1907 Charter has been held unconstitutional by the New Jersey Supreme Court.

It should be noted that the referendum question, which was in the only language permitted by *N. J. S. A.* 40:69A-14, did not call upon the voters to pass upon a form of government providing for Plan D with a run-off. Neither did the interpretive statement on the ballot refer to a run-off. The voters were merely asked whether or not they approved Mayor-Council Plan D providing for a division of the city into six wards with nine councilmen, one to be elected from each ward and three to be elected at large. To this question, they answered in the affirmative by an overwhelming margin in a vote of 9710 to 3841.

██ The fact remains, moreover, that there is no authority for a combination of plans. The voters cannot be

presented with a choice of one feature from one acceptable plan and one from another. *Hodges v. Van Fleet,* 55 *N. J.* 528 (19.0). The Legislature has made available as separate entities those forms of government which it has approved, and Plan D with a run-off is not included among them. When the voters approved Plan D, they must be deemed to have approved it as authorized by the Legislature, namely Mayor-Council Plan D without a run-off.

It is, of course, regrettable that the charter commissioners issued and caused to be dispatched publicity containing a misstatement as to the need for a run-off. The misstatement is all the more unfortunate in view of the fact that the footnote in their report indicated that there was at least "a shadow of a doubt" in their minds. If there were no such doubt, they would not have recommended repeal of the legislation specifically precluding a run-off, *N. J. S. A.* 40:69A–161.1. Incidentally, there appears to be no authority for the charter commissioners sending out the publicity at all. Under *N. J. S. A.* 40:69A–10 they are directed only to file the original report with the municipal clerk, and "deliver to the municipal clerk sufficient copies of any such report to permit distribution to any interested citizen." They are not directed to summarize or propagandize after their report has finally been made.

In any event, the principal and overriding consideration for the voters was the form of government, not the election procedure. The type of government itself was the big issue, and the election procedure merely peripheral. Surely, the form of government was the only issue upon which the people actually voted, and in view of the huge margin by which Plan D was adopted it is most unlikely that it would have been rejected if the voters had been specifically informed that no run-off would ensue if no candidate received a majority of the total votes cast.

As far as plaintiff is concerned, the fact that the necessity of a run-off is at least questionable should come as no sur-

prise. The city clerk of Paterson, through Paterson's Legal department filed complaint for declaratory judgment on January 4, 1974 on the question of the run-off requirement, making the Attorney General of New Jersey defendant. After the court refused to rule on the matter because no justiciable issue had been presented, the city counsel, Adolph Romei, by a letter dated January 8, 1974, advised the city clerk that "you are not to provide for or conduct run-off elections in Paterson and the candidates receiving the greatest number of votes for the offices sought will be the candidates elected to those offices."

At that time in January 1974 plaintiff did not make any move whatever to cancel or postpone the election to be held on May 14, 1974, nor to set aside the referendum of November 1973 as being the result of misinformation and to seek a new referendum as he now does. Only after his narrow defeat being confirmed by a recount obtained by him does he come to court to urge that the will of the voters will be thwarted if there should be no run-off, and only after such defeat does he now ask for a new referendum if the court should deny a run-off, and that meanwhile he should remain in office.

The people of Paterson have been subject to uncertainty about their form of government since the present form of government was declared invalid in July 1972. If the court were now to declare the referendum of November 1973 to be void, it would mean that the people of Paterson would not only be required to endure further uncertainty, but would also have to continue under the present invalid form of government, about which the opinion in *Mason v. Paterson, supra,* said: "No logical reason can be perceived as to why all local legislative functions in Paterson must be performed by officials appointed by the Mayor while they are performed by elected representatives in all other municipalities of the State."

Furthermore, it might not be sufficient merely to call for a new referendum on Plan D. If there is any merit at all to plaintiff's contention, a new report and recommendation would be needed. Perhaps even a new election of charter study commissioners would be required. The chairman of the old commission has become a judge and resigned on August 28, 1973. His successor was thereafter appointed pursuant to *N. J. S. A.* 40:69A–6 after the final report had been adopted. Of the other four commissioners, three of them were councilmanic candidates in the election of May 14, 1974, one of them being successful. All these are defendants in this action. Moreover, it is likely that the voters would feel more secure with a charter study commission whose mistake did not cause this controversy. At any rate, there is no question but that the alternative relief sought by plaintiff would produce further delay of major proportions.

In conclusion, as regrettable as it is that the charter commission circulated publicity with incorrect information concerning the tangential matter of a run-off requirement, the countervailing public policy issues here must be weighed in the balance. The public policy question concerning the brochure pales into insignificance against the public policy question of allowing a candidate who finished second in an election for mayor to continue indefinitely to be mayor, and under a discredited and invalid form of government.

In view of all the foregoing, the relief sought in the complaint will be denied. An order should be submitted accordingly.